# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-020

Filing Date: May 27, 2021

No. S-1-SC-37210

**STATE OF NEW MEXICO,**

      Plaintiff-Petitioner,

v.

**SEAN VEST,**

      Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Marci E. Beyer, District Judge**

Released for Publication June 29, 2021.

Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Respondent

## OPINION

**VIGIL, Justice.**

## I.    INTRODUCTION

**{1}**    Defendant Sean Vest was convicted of aggravated fleeing a law enforcement officer after he led an officer on a high-speed chase through rain-slicked streets during the early morning hours. Defendant's case regarding a police chase requires us to interpret the aggravated fleeing statute, NMSA 1978, § 30-22-1.1 (2003). In pertinent part, the crime of aggravated fleeing "consists of a person willfully and carelessly driving [a] vehicle *in a manner that endangers the life of another person* after being given a

visual or audible signal to stop" by law enforcement. *Id.* (emphasis added). The question posed here is whether the statute's requirement that a defendant drive "in a manner that endangers the life of another" means that another person was literally put in danger by Defendant's conduct (actual endangerment) or whether dangerous driving that places a community at risk of harm is enough. Pursuant to Article VI, Section 3 of the New Mexico Constitution and NMSA 1978, Section 34-5-14(B) (1972), we review this case on writ of certiorari to the Court of Appeals. We ultimately conclude that dangerous driving that poses a risk of endangerment is enough.

## II.     BACKGROUND

{2}      This case centers on a high-speed police chase. While on patrol near 3:00 a.m., New Mexico State University Officer Jake Capraro came across a vehicle parked near a campus lot. Sitting inside the car were the owner of the vehicle and Defendant. The owner and Defendant had smoked marijuana earlier that night and were in the process of trying to buy more from one of Defendant's local contacts.

{3}      As Officer Capraro's vehicle approached the parked vehicle, the owner exited from the driver's side, spotted Officer Capraro, and ran toward him. When the owner reached the police vehicle, he informed Officer Capraro that Defendant had just threatened him with a knife and was currently stealing his car. Officer Capraro then saw the vehicle's brake lights flash as the car pulled away. He engaged his lights and sirens and pursued the vehicle. Defendant sped away from him. Officer Capraro drove at approximately seventy miles per hour trying to keep up with Defendant as he raced down a main street near the university. Defendant was fleeing at a faster speed, and Officer Capraro could not catch up to him. Officer Capraro continued his pursuit as Defendant drove over a bridge crossing Interstate 25 and sped past an apartment complex.

{4}      Officer Capraro began to slow down as he reached the apartment complex due both to the slippery conditions and because he could no longer see Defendant, who had maneuvered around an upcoming curve in the road. Having lost sight of Defendant, Officer Capraro used his spotlight to look down the residential streets in the area. Eventually, Officer Capraro came upon Defendant's vehicle abandoned in the middle of a traffic lane. Defendant had driven up onto the sidewalk, crashed into a road sign, and fled on foot. The police canine unit later located Defendant in a nearby arroyo. Defendant was apprehended and subsequently indicted by a grand jury for aggravated fleeing a law enforcement officer, contrary to Section 30-22-1.1, and armed robbery, contrary to NMSA 1978, Section 30-16-2 (1973).

{5}      Following trial, the jury acquitted Defendant of armed robbery but convicted him of aggravated fleeing. The Court of Appeals reversed Defendant's conviction, concluding that the crime of aggravated fleeing required evidence that another person was actually endangered by Defendant's careless driving and that the State had failed to present sufficient evidence of this element of the crime. *State v. Vest*, 2018-NMCA-060, ¶ 1, 428 P.3d 287. As we explain herein, we interpret the aggravated fleeing

statute to encompass Defendant's conduct in this case and therefore also hold that there was sufficient evidence of the crime.

## III.    DISCUSSION

**{6}**    This case presents two questions: (1) whether the Legislature intended that a defendant could be convicted of aggravated fleeing in situations where "no other persons [were] in the vicinity of the pursuit"; and (2) whether the Court of Appeals applied the correct standard in its review for sufficient evidence of aggravated fleeing. We conclude that a defendant can be convicted without proving that there was another person actually in the vicinity of the pursuit. For that reason, we reverse the Court of Appeals' conclusion that Defendant's conviction was not supported by sufficient evidence.

### A.    Dangerous Driving Creates a Risk of Harm to the Lives of Others and Is Therefore Enough to Convict a Defendant of Aggravated Fleeing

**{7}**    We first analyze the question of whether the Legislature intended the aggravated fleeing statute to apply in a situation where Defendant drove "willfully and carelessly" to escape law enforcement, but where no other person was actually in the vicinity of the pursuit. Put another way, we analyze whether careless driving "in a manner that endangers the life of another person," § 30-22-1.1, is satisfied only when a specific individual is exposed to life-threatening harm as a result of a defendant's conduct, or whether this element is satisfied if the defendant drives in such a careless way that it exposes the public to serious risk of danger. This is a matter of statutory interpretation, which we review de novo. *State v. Padilla*, 2008-NMSC-006, ¶ 7, 143 N.M. 310, 176 P.3d 299.

**{8}**    The Court of Appeals concluded that "a conviction under the aggravated fleeing statute requires a finding of actual endangerment." *Vest*, 2018-NMCA-060, ¶ 1. In conducting its statutory analysis, the Court of Appeals focused on the word *endangers*, drawing on a number of dictionary definitions to say that *endanger* means "the exposure to the peril or harm is an actual or current condition facing the impacted person." *Vest*, 2018-NMCA-060, ¶ 9. The Court determined that "[n]one of the[] [dictionary] definitions indicate[d] a potential or future condition" and therefore concluded that "the plain language of the statute does not contemplate potential or future harm in its use of the word 'endanger.'" *Id.*

**{9}**    Defendant agrees with the Court of Appeals' plain language interpretation and urges us to hold that the crime of aggravated fleeing requires proof that a defendant drove in a manner that actually endangered the life of another individual. Defendant asserts that the plain language of the statute compels this interpretation because "[it] does not say, as it easily could, that the defendant drove carelessly in a manner that 'may' or 'was likely to' endanger another person."

**{10}**    Defendant also sets forth policy reasons as to why this is the proper interpretation. Defendant suggests that a broader interpretation of the statute would

minimize the deterrent effect of a statute whose "purpose is to protect the public" because it would treat defendants who flee law enforcement on open, empty roads the same as defendants who flee in crowded areas. Defendant clarifies that endangering the life of another person does not necessarily mean that a defendant must have inflicted death or harm on a particular person, but it at least requires an evidentiary showing that the life of a particular person was actually, not just theoretically, put at risk.

**{11}** Quoting the Court of Appeals, Defendant argues that to hold as sufficient theoretically putting another person at risk would frustrate the whole purpose of the statute by turning all instances of fleeing into aggravated fleeing, when the "Legislature clearly intended to create 'a hierarchy of criminal liability.'" *See Vest*, 2018-NMCA-060, ¶ 8.

**{12}** The State rebuts by asserting that the Court of Appeals failed to give effect to the legislative intent underlying the statute when it announced that aggravated fleeing requires actual endangerment. The State explains that in enacting the aggravated fleeing statute, the Legislature meant to protect the public from the dangers of high-speed police chases. In furtherance of this intent, the State argues, quoting *Coleman v. Commonwealth*, that the statute does not require "another person to be 'actually imperiled by an imminent collision.'" 660 S.E.2d 687, 690 (Va. Ct. App. 2008). The State argues that the underlying legislative purpose of protecting communities from potential harm due to high-speed chases demands interpreting the language of this statute to mean that holding "careless driving that *could* result in harm to another person" is enough to convict a defendant of aggravated fleeing. (Emphasis added.) In making its argument, the State stresses that a defendant's culpability should be based on the decision to flee "and drive carelessly and dangerously in doing so." We agree and reverse the Court of Appeals' interpretation of the statute as requiring actual endangerment.

**{13}** We interpret the aggravated fleeing statute to require only that a defendant willfully and carelessly drove so dangerously that the defendant created a risk of harm, a risk that could have endangered someone in the community. We come to this conclusion after conducting a thorough statutory construction analysis. *See* NMSA 1978, § 12-2A-18(A) (1997) ("A statute . . . is construed, if possible, to: (1) give effect to its objective and purpose; (2) give effect to its entire text; and (3) avoid an unconstitutional, absurd or unachievable result.").

1. **A plain-meaning interpretation of the phrase "in a manner that endangers" reveals that the statute's focus is on the defendant's conduct**

**{14}** "This Court's primary goal when interpreting statutes is to further legislative intent." *Jordan v. Allstate Ins. Co.,* 2010-NMSC-051, ¶ 15, 149 N.M. 162, 245 P.3d 1214. In furtherance of this goal, we first consider the plain meaning of the statute. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047 ("We use the plain language of the statute as the primary indicator of legislative intent." (brackets omitted) (internal quotation marks and citation omitted)) In conducting our de novo review of a statute, we "look to the plain language of the statute to determine if the statute can be enforced as

written." *Padilla*, 2008-NMSC-006 ¶ 14. When words are not otherwise defined in a statute, we "giv[e] those words their ordinary meaning absent clear and express legislative intention to the contrary." *State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863. To do so, we consult common dictionary definitions. *State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830.

**{15}** We begin our analysis by looking at the words of the aggravated fleeing statute:

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.

Section 30-22-1.1(A). We are specifically concerned with the phrase, "in a manner that endangers the life of another person." We interpret this phrase piece by piece.

**{16}** The word "manner" means, "the mode or method in which something is done or happens: a mode of procedure or way of acting: way, mode, fashion." *Webster's Third New International Dictionary* 1376 (1986); *see also New Oxford American Dictionary* 1065 (3d ed. 2010) (defining manner as "[a] way in which a thing is done or happens; . . . a person's outward bearing or way of behaving toward others"); *Black's Law Dictionary* 963 (6th ed. 1990) (defining manner as "[a] way, mode, method of doing anything, or mode of proceeding in any case or situation"). The word "manner" is synonymous with "way, fashion, mode, means, method, system, style, approach." *Oxford American Writer's Thesaurus* 551 (2d ed. 2008).

**{17}** The phrase "in a manner" describes a certain way of acting. It characterizes the method by which a person is doing something. Using examples, Brian Garner explains it this way. The phrase

> [in a] manner . . . typifies the style of a writer whose prose reads slowly. In a *professional manner* should be *professionally*; in a *rigid manner* should be *rigidly*; in a *childish manner* should be *childishly*. Good editors do not leave such phrases untouched. Still, some phrases cannot be made into -*ly* adverbs: *in a Rambo-like manner; in a determined manner* . . . .

*Garners Dictionary of Legal Usage* 563 (3d ed. 2011). Garner's definition reminds us that the phrase, "in a manner," means nothing in particular if used on its own. Only when the phrase is coupled with a description of the manner in which something is done do we know what type of conduct to look for. As applied to the statutory language at issue here, the word "endangers" tells us what type of driving the statute prohibits. We therefore interpret the plain meaning of "in a manner that endangers," to mean "in a dangerous manner" or "dangerously." *See Black's Law Dictionary* 978 (11th ed. 2019)

(defining interpret as "ascertain[ing] the meaning and significance of thoughts expressed in words").

**{18}** The Court of Appeals overlooked the meaning of the phrase as a whole. Instead, the Court of Appeals examined the word "endangers" in isolation and determined that it meant actual endangerment. *See Vest*, 2018-NMCA-060, ¶ 9. In doing so, the Court of Appeals ignored the context of the word in the statute. *See id.* In context, the word "endangers" refers to the manner of the defendant's conduct (as opposed to the resulting outcome of the conduct). It must. Otherwise, the phrase "in a manner" would bear no meaning at all, rendering that part of the statute superfluous. *See State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous." (quoting *Katz v. N.M. Dep't of Hum. Servs., Income Support Div.*, 1981-NMSC-012, ¶ 18, 95 N.M 530, 624 P.2d 39 (1981))).

**{19}** The phrase—"in a manner that endangers the life of another person"—in its *entirety* describes the criminalized conduct in the aggravated fleeing statute. To be found guilty, the defendant must have driven so dangerously that his or her conduct endangered not just the safety, but the *lives* of others. Our analysis leads us to conclude that "in a manner that endangers the life of another person" refers to the criminalized conduct of the defendant, not the outcome of the defendant's conduct. That is to say, the statute does not require that an identifiable person was actually endangered as a result of the defendant's flight from law enforcement. Therefore, the plain meaning of the statute reveals that a defendant is guilty of aggravated fleeing if he or she fled police by driving in a way that threatened the lives of people in the community.

**{20}** The plain language, "in a manner that endangers the life of another person" is unambiguous, and therefore this analysis need go no further. *See Draper v. Mountain States Mut. Cas. Co.*, 1994-NMSC-002, ¶ 4, 116 N.M. 775, 867 P.2d 1157 ("If the language of the statute is clear and unambiguous it is to be given effect."). However, as a matter of thoroughness, we review the purpose, background, and history of the statute to ensure that our plain-meaning interpretation does not lead to "injustice, absurdity, or contradiction." *Padilla*, 2008-NMSC-006, ¶ 7. We find that these other canons of construction support our plain-meaning interpretation.

### 2. The legislative intent of protecting communities against the risk of harm posed by high-speed chases supports this plain-meaning interpretation of the statute

**{21}** "[L]egislative intent is [this Court's] touchstone when interpreting a statute." *Id.* ¶ 10. We must give effect to legislative intent and "will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature." *Id.* (internal quotation marks and citation omitted). If statutory language is "doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity, or contradiction, the court should reject the plain meaning

rule in favor of construing the statute according to its obvious spirit or reason." *Id*. ¶ 7 (internal quotation marks and citation omitted).

**{22}** The legislative purpose underlying the aggravated fleeing statute is consistent with our plain-meaning analysis. In this case, we discern the legislative purpose by considering the context of the aggravated fleeing statute within the greater statutory scheme. *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 ("[W]e closely examine the overall structure of the statute we are interpreting, as well as the particular statute's function within a comprehensive legislative scheme[.]" (citation omitted)); *Sims v. Sims*, 1996-NMSC-078, ¶ 21, 122 N.M. 618, 930 P.2d 153 ("When attempting to unravel a statutory meaning we begin with the presumption that the statutory scheme is comprehensive."). In doing so, we look at the ways in which the act of bad driving violates both our Motor Vehicle Code and our Criminal Code.

**{23}** Under the Motor Vehicle Code, the Legislature has enumerated two crimes that punish poor driving: (1) careless driving and (2) reckless driving. The misdemeanor of careless driving is defined as "operat[ing] a vehicle in a careless, inattentive or imprudent manner, without due regard for the width, grade, curves, corners, traffic, weather and road conditions and all other attendant circumstances." NMSA 1978, § 66-8-114(B) (1969). The greater offense of reckless driving is defined as "driv[ing] any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." NMSA 1978, § 66-8-113(A) (1987). The difference between careless driving and reckless driving is that reckless driving requires a defendant to have engaged in more dangerous conduct while also possessing a mens rea to injure or harm others by "willful or wanton disregard of the rights or safety of others."

**{24}** Under our Criminal Code, the Legislature has used a similar gradation in two enumerated crimes that punish fleeing a law enforcement officer: (1) resisting, evading, or obstructing an officer and (2) aggravated fleeing. The misdemeanor offense of resisting or evading an officer consists of "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle." NMSA 1978, § 30-22-1(C) (1981). The greater (fourth-degree felony) offense of aggravated fleeing a law enforcement officer adds the requirement of "willfully and carelessly driving [a] vehicle in a manner that endangers the life of another person." Section 30-22-1.1.

**{25}** Like the greater offense under the Motor Vehicle Code (reckless driving), the greater offense under the Criminal Code (aggravated fleeing) also requires that a defendant engage in conduct more dangerous than the conduct of the lesser offense. However, unlike reckless driving, aggravated fleeing does not require a mens rea to injure. Rather, the added mens rea element in the felony of aggravated fleeing—willfully and carelessly—applies to the dangerous conduct. In other words, the defendant must have "willfully and carelessly driv[en]" in a dangerous manner. Unlike the reckless driving statute, the words of the aggravated fleeing statute do not indicate that a

defendant must have intended to endanger anyone in his path but only that he did so through his conduct.

**{26}** When the Legislature adopted this criminal statute, it elevated the misdemeanor of resisting and evading a police officer to the felony of aggravated fleeing if a defendant evades a police officer by driving in a dangerous manner. *See* § 30-22-1(C); § 30-22-1.1; *see also Padilla*, 2008-NMSC-008, ¶ 14 (construing misdemeanor fleeing, as opposed to aggravated fleeing, as occurring "[w]hen a person resists, evades, or obstructs an officer by fleeing without willful[ly] and careless[ly] driving"). The Legislature's intent in enacting this statute was to lessen the number of injuries and deaths occurring in New Mexico due to defendants driving dangerously in an effort to evade the police.[1] A person who attempts to escape the police by willfully and carelessly driving in a dangerous manner must answer not to just a misdemeanor charge but to a felony charge.

**{27}** We agree with the Court of Appeals that "the aggravated fleeing statute . . . evince[es] legislative intent to more severely punish people who jeopardize the safety of others while fleeing from law enforcement officers." *Vest*, 2018-NMCA-060, ¶ 8. However, the mere fact that another person happened to be standing on the street corner or driving nearby when the chase ensued is inconsequential. A defendant's luck that no one was actually close enough in proximity to the defendant's speeding car to be actually endangered by dangerous driving will not absolve the defendant of the crime. To hold otherwise would be to impose a literal interpretation of the words of the statute that "would lead to injustice [and] absurdity." *Padilla*, 2008-NMSC-006, ¶ 7 (internal quotation marks and citation omitted). We therefore "constru[e] the statute according to its obvious spirit [and] reason" in concluding that a defendant who engages in the conduct of driving dangerously jeopardizes the lives of others.

**{28}** The social harm proscribed by the Legislature in the aggravated fleeing statute is conduct, not a particular result. The social harm proscribed by a criminal statute may consist of wrongful conduct, wrongful results, or both. *See* Joshua Dressler, *Understanding Criminal Law*, § 9.10(D), at 14-15 (5th ed. 2009) (distinguishing "conduct crimes" from "result crimes"); s*ee also State v. Granillo*, 2016-NMCA-094, ¶ 17, 384 P.3d 1121 (comparing the drunk driving statute, which "proscribes *harmful conduct* without regard to [the] . . . result" of the conduct, with the murder statute, which "proscrib[es] a *harmful result* without regard to the conduct leading to the result" (emphasis added)). The legislative purpose of the aggravated fleeing statute is to

---

[1] In *State v. Montano*, Justice Nakamura contextualized the Legislature's motivation in its 2003 enactment of the aggravated fleeing statute. *See* 2020-NMSC-009, ¶¶ 75, 88, 468 P.3d 838 (Nakamura, C.J., dissenting) (concluding that the Legislature enacted Section 30-22-1.1 "to criminalize high-speed chases initiated by persons who know they have been signaled to stop by law enforcement"). Two years prior to the statute's enactment, six people were killed "in traffic accidents caused by defendants fleeing officers." *Id*. ¶ 75 (citing Aaron Baca, *State v. Padilla: An Aggravated Reading of the State's Aggravated Fleeing a Police Officer Statute*, 39 N.M. L. Rev. 485, 488 nn.53, 54 (2009). The law review article cited in Justice Nakamura's dissent explains that New Mexico adopted the aggravated fleeing statute "during a wave of similar legislation in other states following increased media coverage and heightened public scrutiny of dangers posed to the public by police pursuits" to "protect[] the public from the dangers of high-speed police chases." Baca*, supra*, at 488, 496, 505.

address the social harm caused when a person engages in the act of driving dangerously in an attempt to escape the police. The statute's phrase, "in a manner that endangers," refers to the criminalized conduct of the defendant without regard for the result of that conduct.

**{29}** Driving in a dangerous manner, similar to drunk driving, is, on its own, inherently risky conduct. It puts a community at risk of harm, which is exactly what the Legislature intended to prevent. Therefore, it is the conduct of fleeing the police by driving dangerously, itself, that violates the aggravated fleeing statute. As we commented in *Padilla*, "[t]he legislative decision to create the crime of aggravated fleeing suggests a hierarchy of criminal liability based on the aggravated nature of a *defendant's conduct*." 2008-NMSC-006, ¶ 14 (emphasis added). However, it is the more dangerous conduct that elevates the misdemeanor to a felony. *State v. Groves*, 2021-NMSC-003, ¶ 26, 478 P.3d 915 ("The crime is elevated to a felony based on the severity of a defendant's conduct when he or she intentionally flees the police."). We emphasize that for the crime of aggravated fleeing a law enforcement officer, the focus is the defendant's *conduct*. As we recently stated in *Groves*, for the purposes of this felony, a defendant's intent to endanger is irrelevant. *See id.* ("The aggravated fleeing statute does not require a defendant to possess a culpable mental state of intending to threaten the welfare of another person's physical safety. The statute criminalizes willful and careless driving in a manner that endangers another person. It does not require that a defendant intend to endanger someone.") What is significant is that Defendant willfully and carelessly engaged in the act of driving in a dangerous manner. In doing so, Defendant de facto put others at risk of harm. Therefore, it would be inconsistent with the intent of this statute to absolve defendants of criminal liability because they were lucky enough to carelessly drive dangerously in an area of town or at a time of night when fewer people were actually around.

**{30}** Defendant argues that focusing on Defendant's conduct is problematic because it treats defendants who flee law enforcement on open, empty roads in the same way it treats defendants who flee in crowded areas. We disagree because, per the statute, a defendant should not be fleeing the police in a dangerous manner in either circumstance. Of course, depending on the circumstances, the risk of harm to the public is sometimes lower or higher. But even in situations where the risk of harm is lower, it is always there. A defendant who drives dangerously in an attempt to flee the police threatens the wellbeing of the whole community. Even though a defendant's intent may not have been to endanger anyone, the defendant's conduct creates a higher risk of accident to everyone. A defendant driving recklessly by ignoring traffic signals or speeding has no way to know who may be standing on the next sidewalk or when another car may appear. *See State v. Misquez*, No. 29,098, mem. op. at 4 (N.M. Ct. App. Mar. 25, 2009) (nonprecedential) (reasoning that the defendant's "actions in intentionally running stop signs and driving in the wrong lane in an attempt to elude the officers present a reasonable probability that someone's life could be endangered even if there is no identifiable person that was at risk").

**{31}** It is the action of dangerous driving and the possibility of danger it poses that the Legislature meant to deter in enacting the statute. The crime of aggravated fleeing was

"designed to protect the general public from the dangers of a high speed chase." *Padilla*, 2008-NMSC-006, ¶ 21. This legislative purpose requires that a defendant who drives dangerously and places the public at risk of harm should be charged with aggravated fleeing.

**{32}** The dissent disagrees with this analysis, criticizing our references to *Groves* and *Padilla* for being used outside of the specific context in which these cases were written. Dissent ¶¶ 46, 61-67, *infra*. While neither case addressed the precise legal issue or presented the same set of circumstances, both cases analyzed the aggravated fleeing statute and thus are instructive to this case. We therefore use this Court's former discussion in these cases to guide and reaffirm our analysis here. Our reliance on *Padilla* and *Groves* is not inconsistent with the overarching legal principles upon which those cases were decided. As such, the dissent's critique that we misconstrue our case law is unpersuasive.

**{33}** The dissent further criticizes our legislative intent analysis for ignoring evidence of the drafting process and neglecting to discuss various versions of the bill that were considered before the law was passed. Dissent ¶¶ 51, 52, *infra*. This was no accident. In fact, we caution against relying on *draft* versions of bills or *proposed* statutory language in interpreting legislative intent. There are countless reasons why language may be added or deleted during the legislative drafting process and, unlike the United States Congress, our Legislature does not keep a record of floor debates or committee hearings. Therefore, we refrain from inferring legislative purpose from such edits.

> Unlike some states, we have no state-sponsored system of recording the legislative history of particular enactments. We do not attempt to divine what legislators read and heard and thought at the time they enacted a particular item of legislation. If the intentions of the Legislature cannot be determined from the actual language of a statute, then we resort to rules of statutory construction, not legislative history.

*Regents of Univ. of N.M. v. N.M. Fed'n of Tchrs.*, 1998-NMSC-020, ¶ 30, 125 N.M. 401, 962 P.2d 1236.

**{34}** Further, we do not analyze the language of bills that died in committee and never became law or bills that were vetoed by the Governor. *See* dissent ¶¶ 53-60, *infra*. We instead rely on the language of the statute as passed and the history of the statute insofar as any amendments may have been made. We consider "the history and background of the statute," *Rivera*, 2004-NMSC-001, ¶ 13, not the "legislative history," dissent ¶ 49, *infra*, of a bill's enactment before it became law. *See, e.g.*, *Unite New Mexico v. Oliver*, 2019-NMSC-009, ¶ 26, 438 P.3d 343 (analyzing the history of a statute by considering the various enacted versions of that statute and similar statutes through time).

**B.     Defendant's Conviction for Aggravated Fleeing Was Supported by Sufficient Evidence of Driving in a Dangerous Manner**

**{35}**     The second question before this Court is whether there was sufficient evidence to convict Defendant of aggravated fleeing. In reviewing sufficiency of the evidence, appellate courts

> must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176 (citations omitted). We use this standard to review the Court of Appeals' reversal of Defendant's conviction in this case. *See State v. Garcia*, 2016-NMSC-034, ¶¶ 15, 23-24, 384 P.3d 1076.

**{36}**     Defendant argues that the evidence at trial was insufficient to support his conviction for aggravated fleeing. Defendant uses his interpretation of the statutory language, "in a manner that endangers," to support his argument that hypothetical endangerment is not enough. He maintains that because no one was in the vicinity of the police chase, the State failed to show actual endangerment, and so his conviction must be vacated.

**{37}**     The Court of Appeals was persuaded by this argument and reversed Defendant's conviction for aggravated fleeing for lack of sufficient evidence of actual endangerment to another person. *Vest*, 2018-NMCA-060, ¶ 15. The Court of Appeals stated, "[A] conviction under the aggravated fleeing statute requires a finding of actual endangerment[,] and the direct and circumstantial evidence at trial was insufficient to support such a finding . . . ." *Id.* ¶ 1. The Court went on: "There was not . . . any evidence presented that Defendant encountered any other motorists on the roadway. As such, no reasonable jury could have found beyond a reasonable doubt that Defendant endangered another person within the meaning of the aggravated fleeing statute." *Id.* ¶ 13.

**{38}**     Our response to the Court of Appeals on this point is two-fold. First, although our determination does not turn on this fact, we disagree with the assessment that there were no motorists on the roadway when Defendant fled from the police. When asked about the traffic and conditions of the road on the night of the chase, Officer Capraro testified that there was "minimal vehicle traffic." We infer from this testimony that there was at least one other motorist on the road when Defendant drove in a dangerous manner to avoid apprehension by a law enforcement officer.

**{39}**     Second, and determinatively, the Court of Appeals failed to apply the correct legal standard in its review of the evidence in this case. As we discussed previously, a

defendant may be convicted of aggravated fleeing regardless of whether the State can prove that another person was near the scene of the chase. When reviewing sufficiency of the evidence in an aggravating fleeing case, what is significant is not whether there was at least one person in the vicinity of the police chase. Rather, the focus is on whether a defendant drove so dangerously that he could have hurt someone who could have been in the vicinity of the pursuit. The question is whether he put the community at risk of harm when he fled the police. The act of driving in a dangerous manner while fleeing police is enough to convict a defendant of aggravated fleeing.

{40}   In this case, testimony revealed that Defendant sped away after seeing Officer Capraro's signals to stop, and during his flight, Defendant exceeded the speed limit on rain-slicked roads. Defendant displayed dangerous driving when he sped at seventy miles per hour on town roads, when he refused to slow down while passing an apartment complex, and when he drove onto a sidewalk and crashed into a road sign. Defendant's conduct put people in the community at risk of harm, including death. Therefore, viewing this evidence in favor of the guilty verdict, a rational juror "could have found the essential elements of [aggravated fleeing] beyond a reasonable doubt." *Cunningham*, 2000-NMSC-009, ¶ 26.

## IV.    CONCLUSION

{41}   For the foregoing reasons, we reverse the Court of Appeals' interpretation of the aggravated fleeing statute. Accordingly, we reverse the Court of Appeals' determination of insufficient evidence and affirm Defendant's conviction for aggravated fleeing a police officer.

{42}   IT IS SO ORDERED.

BARBARA J. VIGIL, Justice

WE CONCUR:

MICHAEL E. VIGIL, Chief Justice

C. SHANNON BACON, Justice

JUDITH K. NAKAMURA, Justice, Retired,
sitting by designation

DAVID K. THOMSON, Justice,
dissenting

THOMSON, Justice (dissenting).

{43}   This case requires us to analyze the statutory phrase "in a manner that endangers the life of another person," to decide whether Defendant violated the aggravated fleeing statute. *See maj. op.* ¶ 19. "A statute must be construed so that no

part of the statute is rendered surplusage or superfluous." *Javier M.*, 2001-NMSC-030, ¶ 32 (alteration, internal quotation marks, and citation omitted). I respectfully dissent, because the majority analysis effectively ends after the word *endangers*. *See maj. op.* ¶¶ 19, 26. In so doing, the majority enlarges the scope of the conduct criminalized by Section 30-22-1.1. *See dissent*, ¶¶ 53-62, 68, *infra*.

**{44}** "As a general rule, penal statutes are strictly construed." 82 C.J.S. Statutes § 526, at 693 (2009).

> [T]he rule of strict construction means that penal statutes will not be held to include offenses . . . other than those which are clearly described by the language of the statute, no matter how deserving of punishment the accused may seem, or even if the court in interpreting and applying particular statutes may think the [L]egislature should have made them more comprehensive.

*Id.* at 693-94 (footnotes omitted). "If a criminal statute is susceptible to more than one reasonable interpretation, the interpretation most favorable to the party facing criminal liability must be adopted." *Id.* at 694.

**{45}** By effectively reading "the life of another person" out of Section 30-22-1.1(A), the majority holds that the State may obtain a conviction if it proves that a defendant willfully and carelessly drives *dangerously*. *See maj. op.* ¶¶ 21, 39 ("[T]he focus is on whether a defendant drove so dangerously that he could have hurt someone who *could have been in the vicinity* of the pursuit." (emphasis added)). I do not dissent based on a public policy choice that favors prohibiting only actual endangerment over prohibiting both actual *and* theoretical endangerment. I dissent because setting public policy is the role of the Legislature, not the judiciary. *See e.g.*, *State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 21, 125 N.M. 343, 961 P.2d 768 ("We have said that only the legislative branch is constitutionally established to create substantive law.").

**{46}** "[T]he life of another person" clarifies exactly what must be put at risk, or *endangered*, for the crime to be committed. Section 30-22-1.1(A)*.* Regardless, the majority asserts, "other canons of construction support [its] plain meaning interpretation." *Maj. op.* ¶ 20. I disagree with the majority's legislative intent analysis, which ignores specific policy choices the Legislature made during the process of enacting Section 30-22-1.1(A), which permits a conviction to stand with no evidence of actual endangerment. *See dissent*, ¶¶ 53-62, 68, *infra*. In addition, the majority's legislative intent analysis relies on statements made by this Court in *Padilla* and *Groves*. *See maj. op.* ¶¶ 29-31. Neither *Padilla* nor *Groves* asked whether the Legislature intended to criminalize a defendant's conduct regardless of any proof that the conduct produced a resultant harm, and neither *Padilla* nor *Groves* support the determination that Section 30-22-1.1(A) permits a conviction without proof of actual endangerment.

## I.    A PLAIN LANGUAGE CONSTRUCTION OF THE STATUTORY LANGUAGE

**{47}**    When construing a statute, "[w]e *first* look to the plain language of the statute to determine if the statute can be enforced as written." *Padilla*, 2008-NMSC-006, ¶ 7 (emphasis added).

**{48}**    The majority claims that the Court of Appeals analysis "overlooked the meaning of ['in a manner that endangers the life of another person'] as a whole." *Maj. op.* ¶ 18. To rectify this error, the majority analysis "interpret[s] this phrase piece by piece." *Id.* ¶ 15. But instead of simply looking at every component part of the phrase to construe the statute, the majority's analysis rewrites the statute in two significant ways. The analysis (1) substitutes *dangerously* for the phrase *in a manner that endangers* and (2) effectively omits the phrase *the life of another person* from the language of the statute. *See id.* ¶¶ 15-18. This analysis alters the substantive elements of the crime, and violates fundamental principles of statutory construction, and commits the very error for which it rebukes the Court of Appeals. *See maj. op.* ¶ 18; *cf. Javier M.*, 2001-NMSC-030, ¶ 32 (stating that a construction that reads a portion of a statute to be superfluous is "inconsistent with the rules of statutory interpretation").

**{49}**    I do not disagree with the general policy statement that "[d]riving in a dangerous manner . . . is, on its own, inherently risky conduct." *Id.* ¶ 29. Nor do I disagree with the conclusion that "[t]he phrase 'in a manner' . . . characterizes the method" of how the culpable act must be performed. *Id.* ¶ 17. However, based on my review of the language of Section 30-22-1.1(A) and the legislative history of its enactment, I do not agree that Section 30-22-1.1(A) simply criminalizes "fleeing the police by driving dangerously." *See maj. op.* ¶ 29.

**{50}**    I disagree with any analysis that effectively omits language from the statute to equate *endangers the life of another person* and instead substitutes *dangerously. See maj. op.* ¶¶ 19, 28 ("Our analysis leads us to conclude that 'in a manner that endangers the life of another person' . . . does not require that an identifiable person was actually endangered as a result of the defendant's flight from law enforcement."); *see also* § 30-22-1.1(A). The Legislature enacted specific language to describe what must result from a defendant's culpable conduct, "willfully and carelessly driving." *See* § 30-22-1.1(A) (requiring that the driving must be done "in a manner that *endangers the life of another person*") (emphasis added). In other words, the life of another person must be put at risk. *See* New Oxford American Dictionary 572 (3rd ed. 2010) (defining "endanger" as to "put (someone or something) at risk or in danger").

**{51}**    Although I believe that the plain language is clear, this Court has repeatedly stated that if the plain language is not clear and unambiguous "we also consider the history and background of the statute." *See e.g., GandyDancer, LLC v. Rock House CGM, LLC*, 2019-NMSC-021, ¶ 13, 453 P.3d 434; *State v. Smith,* 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022; *Rivera*, 2004-NMSC-001, ¶ 13. The majority considers some indicators of legislative intent, but only those that "support" its analysis. *See maj. op.* ¶¶ 22, 33. The majority analysis overlooks the history and background of Section 30-22-1.1(A) that undermines its analysis. Specifically, the majority ignores evidence

that the Legislature intentionally chose to omit specific language that would permit a conviction without proof of actual endangerment. *Compare maj. op.* ¶¶ 21-34, *supra*, with *dissent*, ¶¶ 53-62, 68, *infra*.

**{52}** I cannot agree with the choice to accept indirect speculation on legislative intent while ignoring direct evidence of the drafting of Section 30-22-1.1(A) that illuminates legislative intent. *See maj. op.* ¶¶ 21-33. The majority takes issue with the dissent's review of the history and background concerning the legislative process that specifically omitted language from the statute that would permit a conviction based on the endangerment of a hypothetical person, so that the majority can now read that language back into Section 30-22-1.1, effectively amending it. *See maj. op.* ¶ 33. I cannot agree with this choice to ignore history and background simply because it clearly supports a conclusion that is in opposition to the one the majority wants to reach. Instead, I believe that that Legislature's debate over the specific language is more relevant than the authority on which the majority relies. *See maj. op.* ¶ 26, n.1 ("The law review article . . . explains that New Mexico adopted the aggravated fleeing statute during a wave of similar legislation in other states followed by increased media coverage . . . to protect[] the public from the dangers of high-speed police chases." (third alteration in original) (internal quotation marks and citation omitted)). I now turn to the history and background concerning New Mexico's enactment of Section 30-22-1.1.

## II.     THE LEGISLATURE MADE THE POLICY CHOICE TO REQUIRE ACTUAL ENDANGERMENT

**{53}** This Court effectuates the legislative intent of a statute by "giving words the meaning intended by the thoughts which gave rise to their writing." *United States v. Reese*, 2014-NMSC-013, ¶ 20, 326 P.3d 454. "As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation." *Id.* (internal quotation marks and citation omitted). The history surrounding the enactment of Section 30-22.1.1(A) demonstrates that the Legislature considered the policy choice announced in the majority's opinion and rejected it. The Legislature initially considered criminalizing aggravated fleeing a law enforcement officer during the 2001 Legislative Session. *See* S.B. 633, 45th Leg., 1st Sess. (N.M. 2001). The introduced version of that bill permitted a conviction based solely on theoretical endangerment. In Section 6(A), Senate Bill 633 proposed to enact "[a] new section of the Criminal Code":

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that *may* endanger the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle.

S.B. 633, 45th Leg., 1st Sess. (N.M. 2001) (emphasis added).[2] Senate Bill 633 died in committee.[3]

**{54}** The following year, House Bill 164 was introduced, which proposed to criminalize both actual *and* theoretical endangerment:

> Aggravated fleeing an officer consists of a person driving his vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others, without due caution and circumspection and *at a speed or in a manner so as to endanger or be likely to endanger another person or property*, after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle.

*See* H.B. 164, § 1(A) (introduced version), 45th Leg., 2nd Sess. (N.M. 2002) (emphasis added).[4] The House Judiciary Committee (HJC) recommended that the introduced version of House Bill 164 not be passed. Instead, the HJC issued a committee substitute version of the House Bill 164 that amended the language to use the phrase *may endanger*:

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that *may endanger* the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle.

*See* H.B. 164, HJC Report, 45th Leg., 2nd Sess. (N.M. 2002);[5] H.B. 164 (HJC substitute version), 45th Leg., 2nd Sess. (N.M. 2002) (emphasis added).[6] The HJC substitute bill for House Bill 164 used the same language as Senate Bill 633, which had been introduced during the 2001 Legislature and did not become law. Nonetheless, the HJC substitute bill for House Bill 164 then went to the Senate, proposing to create a crime that would permit a conviction based only on theoretical endangerment.

**{55}** In the Senate, the Senate Judiciary Committee (SJC) recommended that the Legislature pass House Bill 164 with the following significant amendment: "On page 10, line 7, strike 'may endanger' and insert in lieu thereof 'endangers'." H.B. 164, SJC

---

[2]https://www.nmlegis.gov/Sessions/01%20Regular/bills/senate/SB0633.pdf (last visited March 18, 2021).
[3]https://www.nmlegis.gov/Legislation/Legislation?Chamber=S&LegType=B&LegNo=633&year=01 (last visited March 18, 2021).
[4]https://www.nmlegis.gov/Sessions/02%20Regular/bills/house/HB0164.pdf (last visited March 18, 2021).
[5]https://www.nmlegis.gov/Sessions/02%20Regular/bills/house/HB0164JC1.pdf (last visited March 18, 2021).
[6]https://www.nmlegis.gov/Sessions/02%20Regular/bills/house/HB0164JCS.pdf (last visited March 18, 2021).

Report, 45th Leg., 2nd Sess. (N.M. 2002).[7] The removal of *may endanger* to instead require that the conduct *endangers the life of another person* evinces a will to only criminalize actual endangerment, not theoretical endangerment. *See* New Oxford American Dictionary 1082 (defining "may" as "expressing possibility"). The final version of the bill did not contain language of possible or theoretical endangerment:

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the Law Enforcement Safe Pursuit Act.

H.B. 164 (final version), 45th Leg., 2nd Sess. (N.M. 2002).[8] The Legislature passed House Bill 164; however, it did not become law due to the Governor's pocket veto. *See generally*, 2002 N.M. Laws; H.B. 164 (Actions), 45th Leg. 2nd Sess. (N.M. 2002).[9]

**{56}** The following legislative session, four bills were introduced that each proposed to create a new crime of aggravated fleeing a law enforcement officer. *See* S.B. 431, 46th Leg., 1st Sess. (N.M. 2003);[10] S.B. 531, 46th Leg., 1st Sess. (N.M. 2003);[11] H.B. 30, 46th Leg., 1st Sess. (N.M. 2003);[12] H.B. 87, 46th Leg., 1st Sess. (N.M. 2003).[13]

**{57}** One of the four bills, Senate Bill 531, proposed to criminalize "a person driving while under the influence of intoxicating liquor or drugs . . . and willfully refusing to stop his motor vehicle after being given a visual or audible signal to stop." Notably, Senate Bill 531 did not require *any* endangerment; it just required proof that a defendant refused to stop while doing something inherently dangerous, driving under the influence. This bill never made it out of committee. *See* S.B. 531 (Actions), 46th Leg., 1st Sess. (N.M. 2003).[14]

---

[7] https://www.nmlegis.gov/Sessions/02%20Regular/bills/house/HB0164JU1.pdf (last visited March 18, 2021).

[8] https://www.nmlegis.gov/Sessions/02%20Regular/FinalVersions/house/H0164.pdf (last visited March 18, 2021).

[9] https://www.nmlegis.gov/Legislation/Legislation?Chamber=H&LegType=B&LegNo=164&year=02 (last visited March 18, 2021).

[10] https://www.nmlegis.gov/Sessions/03%20Regular/bills/senate/SB0431.pdf (last visited March 18, 2021).

[11] https://www.nmlegis.gov/Sessions/03%20Regular/bills/senate/SB0531.pdf (last visited March 18, 2021).

[12] https://www.nmlegis.gov/Sessions/03%20Regular/bills/house/HB0030.pdf (last visited March 18, 2021).

[13] https://www.nmlegis.gov/Sessions/03%20Regular/bills/house/HB0087.pdf (last visited March 18, 2021).

[14] https://nmlegis.gov/Legislation/Legislation?Chamber=S&LegType=B&LegNo=531&year=03 (last visited March 22, 2021).

**{58}** The other three other bills that were introduced during the 2003 Legislative Session used identical language to each other and to House Bill 164 from the 2002 Legislative Session, which had been vetoed by the Governor:

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.

House Bill 87 died in committee. Senate Bill 431 was pocket-vetoed. House Bill 30 was signed by the Governor and became law. *See* H.B. 87 (Actions), 46th Leg., 1st Sess. (N.M. 2003)[15]; S.B. 431 (Actions), 46th Leg., 1st Sess. (N.M. 2003)[16]; H.B. 30 (Actions), 46th Leg., Sess. 1st Sess. (N.M. 2003)[17]; 2003 N.M. Laws, ch. 260, § 5. The crime of aggravated fleeing a law enforcement officer was compiled at Section 30-22-1.1(A) effective July 1, 2003, and has not been amended by the Legislature.

**{59}** The Legislature considered criminalizing conduct that would permit a conviction based on theoretical endangerment and rejected that option. The majority resurrects that option to permit a conviction based on theoretical endangerment because the majority adjudges that driving dangerously "threatens the wellbeing of the whole community." *See maj. op.* ¶¶ 19, 26-28, 30. The majority's opinion permits the State to convict a defendant without any proof that *the life of another person* was endangered. *But see* § 30-22-1.1(A); UJI 14-2217NMRA. Based on the history and background of Section 30-22-1.1, I believe that the Legislature intended to criminalize actual endangerment, not theoretical endangerment, in line with the Court of Appeals opinion. *See Vest*, 2018-NMCA-060, ¶¶ 7-9.

**{60}** Whether the policy choice to require proof of actual endangerment is wise or right is not before this Court, and I am compelled by the separation of powers to acknowledge that the power to make policy resides in the Legislature, not this Court. *See* N. M. Const. art. III, § 1 ("The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted."); *see also State ex rel. Taylor*, 1998-NMSC-015, ¶ 21; *Eturriaga v. Valdez*, 1989-NMSC-080, ¶ 17, 109 N.M. 205, 784 P.2d 24 ("It is not the province of this Court to invalidate substantive policy choices made by the [L]egislature."). I respectfully suggest that this Court's

---

15https://nmlegis.gov/Legislation/Legislation?Chamber=H&LegType=B&LegNo=87&year=03 (last visited March 22, 2021).

16https://nmlegis.gov/Legislation/Legislation?Chamber=S&LegType=B&LegNo=431&year=03 (last visited March 22, 2021).

17https://nmlegis.gov/Legislation/Legislation?Chamber=H&LegType=B&LegNo=30&year=03 (last visited March 22, 2021).

authority does not include the alteration of the substantive elements of a criminal statute that was lawfully enacted by the Legislature after extensive deliberation of the topic, unless we determine the statute violates the Constitution.

### III.    *PADILLA* AND *GROVES* DO NOT SUPPORT THE MAJORITY CONCLUSION

**{61}**    I also do not agree that our previous opinions in *Padilla* or *Groves* actually support the majority analysis. The majority asserts, "for the crime of aggravated fleeing a law enforcement officer, the focus is the defendant's *conduct*." *Maj. op.* ¶ 29 (citing *Padilla*, 2008-NMSC-006, ¶ 14; *Groves*, 2021-NMSC-003, ¶ 26). I believe that the majority analysis read statements made by this Court in *Padilla* and *Groves* outside of context in which they were written to support propositions that *Padilla* and *Groves* did not contemplate.

**{62}**    The majority cites *Padilla* and states that "the conduct of fleeing the police by driving dangerously . . . violates the aggravating fleeing statute" because "[t]he legislative decision to create the crime of aggravated fleeing suggests a hierarchy of criminal liability based on the aggravated nature of a defendant's conduct." *Maj. op.* ¶ 29 (quoting *Padilla*, 2008-NMSC-006, ¶ 14). However, *Padilla* states, two sentences later: "Because fleeing is made worse or more serious when the person flees in a manner that *endangers the lives of others*, the Legislature chose to make the crime [of aggravated fleeing] a fourth degree felony." 2008-NMSC-006, ¶ 14 (emphasis added) (internal quotation marks and citation omitted). I therefore read *Padilla* to support the view expressed in this dissent. The *Padilla* Court clarified that it is the actual endangerment of *the life of another person*, the result of a defendant's willful and careless driving, that elevates the crime of aggravated fleeing a law enforcement officer, *not* "the propriety of the law enforcement agency's pursuit policy" as the defendant in *Padilla* had argued. *Id.* ("The manner in which the officer conducts a high speed pursuit is not logically a fact or situation that increases the degree of liability or culpability for a criminal act." (internal quotation marks and citation omitted)).

**{63}**    The majority states that Section 30-22-1.1(A) "focus[es on] the defendant's *conduct*" and thus the statute does not require actual endangerment because "a defendant's intent to endanger is irrelevant." *Maj. op.* ¶ 29 (citing *Groves*, 2021-NMSC-003, ¶ 26). *Groves*, however, made no such proclamation. *Groves* stated that

> [t]he aggravated fleeing statute does not require a defendant to possess a culpable mental state of intending to threaten the welfare of another person's physical safety. The statute criminalizes willful and careless driving in a manner that endangers another person. It does not require that a defendant intend to endanger someone.

2021-NMSC-003, ¶ 26. But it did so in the context of determining whether Section 30-22-1.1(A) could be used as a "predicate felony" to elevate what would otherwise be second-degree murder to first-degree murder under New Mexico's murder statute. *Groves*, 2021-NMSC-003, ¶ 1; NMSA 1978, § 30-2-1(A)(2) (1994) ("Murder in the first

degree is the killing of one human being by another without lawful justification or excuse . . . in the commission of or attempt to commit any felony.").

**{64}**    *Groves* determined that Section 30-22-1.1(A) may serve as a predicate felony because the "felonious purpose" of a defendant that commits aggravated fleeing a law enforcement officer is "independent of the felonious purpose of second-degree murder. The felonious purpose of the aggravated fleeing statute is to flee from law enforcement to avoid apprehension." *Groves*, 2021-NMSC-003, ¶ 28. The *Groves* Court was not asked to construe the required elements of Section 30-22-1.1(A). Further, the *Groves* Court's determination that the felonious purpose of Section 30-22-1.1(A) is not "to injure or kill" does not equate to a determination that Section 30-22-1.1(A) does not require a specific, resultant harm that flows from a defendant's culpable conduct. Respectfully, Section 30-22-1.1(A) requires that a defendant perform proscribed culpable conduct *and* that the specified resultant harm flow from that conduct.

**{65}**    The majority is determined to *focus* on a defendant's conduct to justify its holding, and in doing so ignores the fact that Section 30-22-1.1 criminalizes *both* a defendant's conduct (willful and careless driving) *and* the result (the endangerment of the life of another). *See* NMSA 1978, § 30-22-1.1 (2003); *see also* Joshua Dressler, *Understanding Criminal Law*, § 9.10(D), at 111-112 (8th ed. 2018) ("Social Harm: General Principles"); Wayne R. LaFave, *Substantive Criminal Law*, § 6.3, at 611-627 (3rd ed. 2018) ("Concurrence of acts and results with mental fault"). If Section 30-22-1.1 were not concerned with both, the Legislature could have simply defined the crime as willful and careless driving done in a dangerous manner after being given a signal to stop by law enforcement; the Legislature did not do so. Nonetheless, the majority effectively treats the phrase—the life of another person as surplusage. *But see Javier M.*, 2001-NMSC-030, ¶ 32 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous." (alteration, internal quotation marks, and citation omitted)). Section 30-22-1.1 requires a result or attendant circumstance to the willful and careless driving; a defendant's conduct *must* endanger the life of another person for a defendant to violate Section 30-22-1.1.

**{66}**    "Frequently, it is necessary for a lawyer or court to distinguish between *conduct*, *result*, and *attendant circumstance* elements in the definition of the crime." Dressler, *Understanding Criminal Law*, § 9.10(D), at 111 (internal punctuation omitted) (emphasis added). Like Section 30-22-1.1, "an offense may contain both 'conduct' and 'result' elements." Dressler, *Understanding Criminal Law*, § 9.10(D)(2), at 111. In terms of conduct and result, Section 30-22-1.1 could be construed to require "the life of another person" be endangered. Alternatively, Section 30-22-1.1 could be construed to require an "attendant circumstance"—that there be another person in the vicinity of the pursuit whose life is endangered. *See* Dressler, *Understanding Criminal Law*, § 9.10(D)(3), at 112 ("The 'social harm' of the offense, definitionally speaking, has not occurred unless the specified attendant circumstances are present." (emphasis omitted)). Regardless of whether one views Section 30-22-1.1 to require actual endangerment as a *result* or an *attendant circumstance*, I do not agree that the statute only criminalizes a defendant's conduct. I believe that the Legislature chose language that requires more than "the

conduct of fleeing the police by driving dangerously" in order for a defendant to violate Section 30-22-1.1, contrary to the majority.

{67}    Finally, I am compelled to reiterate that neither *Padilla* nor *Groves* support the majority's conclusion based. *Groves* did determine that Section 30-22-1.1 "does not require that a defendant intend to endanger someone." 2021-NMSC-003, ¶ 26. Thus, the *Groves* Court simply determined that a defendant can violate Section 30-22-1.1 without specific intent or purpose to harm another person. *Id.*  Nonetheless, Section 30-22-1.1 can, and does, require a resultant harm or attendant circumstance—a defendant's conduct must "endanger[] the life of another person." *Cf. Padilla*, 2008-NMSC-006, ¶ 41 ("The language of a statute determines the essential elements of an offense.") (Chavez, J., dissenting).

## IV.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A DETERMINATION OF ACTUAL ENDANGERMENT

{68}    The majority's sufficiency of the evidence analysis applies the legal standard it now announces: "the focus [should be] on whether a defendant drove so dangerously that he *could* have hurt someone who *could* have been in the vicinity of the pursuit." *See maj. op.* ¶ 39 (emphasis added). Respectfully, this was not the standard upon which the jury was instructed.

{69}    Jury Instruction No. 4, modeled on UJI 14-2217, stated in relevant part: "For you to find the defendant guilty of aggravated fleeing a law enforcement officer . . . the state must prove to your satisfaction beyond a reasonable doubt . . . [that t]he defendant drove willfully and carelessly in a manner *that endangered* the life of another person." (Emphasis added.) The language of UJI 14-2217 and Jury Instruction No. 4 accurately reflect the language of Section 30-22-1.1. The majority, however, reads Jury Instruction No. 4 to only require a determination that Defendant drove "in a dangerous manner while fleeing police." *See maj. op.* ¶ 39. I disagree with the majority's sufficiency of the evidence review insofar as it affirms Defendant's conviction based on a lower legal standard than was required by the instructions provided to the jury. *See State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 ("[T]he [j]ury instructions become the law of the case against which the sufficiency of the evidence is to be measured.") (alterations in original) (internal quotation marks and citation omitted).

{70}    As the Court of Appeals correctly observed, "here, the record is completely devoid of evidence of actual endangerment to passengers or other motorists." *Vest*, 2018-NMCA-060, ¶ 15. Officer Capraro testified that "there was minimal vehicle traffic," not that another person was endangered or that another person was actually in the vicinity of the pursuit. *Maj. op.* ¶ 38 (internal quotation marks omitted). The jury is permitted to make a "reasonable inference," but that must be "a conclusion arrived at by a process of reasoning which is a rational and logical deduction from facts admitted or established by the evidence." *Garcia*, 2016-NMSC-034 (alterations, internal quotation marks, and citation omitted). However, an inference is not reasonable if it is "buttressed by surmise and conjecture." *State v. Tovar*, l982-NMSC-119, ¶ 8, 98 N.M. 655, 651 P.2d 1299. The testimony that traffic was "minimal," without more, does not permit a

reasonable inference that another person was endangered, and therefore, the State failed to meet its burden. *Garcia*, 2016-NMSC-034, ¶ 24.

**{71}**   There was no evidence presented at trial that Defendant's vehicle ever came close to interacting, endangering, or harming, another person or vehicle. Therefore, I would hold that no reasonable jury could have found beyond a reasonable doubt that Defendant drove "in a manner that endangered the life of another person" as the Legislature required when it enacted Section 30-22-1.1.

## V.    CONCLUSION

**{72}**   Based on the foregoing, I dissent from the majority and would affirm the Court of Appeals.

**DAVID K. THOMSON, Justice**