The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: July 21, 2022

**NO. S-1-SC-38437**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner/Cross-Respondent,

v.

**GREGORY MARVIN HOBBS,**

Defendant-Respondent/Cross-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Freddie J. Romero, District Judge**

Hector H. Balderas, Attorney General
Lauren Joseph Wolongevicz, Assistant Attorney General
Santa Fe, NM

for Petitioner and Cross-Respondent

New Mexico Innocence & Justice Project
University of New Mexico School of Law
Barbara Louise Creel
Albuquerque, NM

for Respondent and Cross-Petitioner

**OPINION**

**ZAMORA, Justice.**

{1}     In this case of first impression, we clarify the analysis district courts must apply in determining whether to grant postconviction relief based on deoxyribonucleic acid (DNA) test results obtained after a guilty verdict under NMSA 1978, Section 31-1A-2(I) (2019). Section 31-1A-2(I) provides that "[i]f the results of the DNA testing are exculpatory, the district court may set aside the petitioner's judgment and sentence, may dismiss the charges against the petitioner with prejudice, may grant the petitioner a new trial or may order other appropriate relief."[1] *Id.* We hold that in analyzing whether to grant postconviction relief, the district court must first make a threshold determination as to whether the test results are "exculpatory," that is, they reasonably tend to establish the petitioner's innocence or negate the petitioner's guilt. Second, if the district court finds the DNA evidence is exculpatory, the controlling inquiry under Section 31-1A-2(I) is whether and to what extent the evidence would have changed the result of the petitioner's

---

[1]Section 31-1A-2 was amended in 2019, after the district court proceedings and during the Court of Appeals proceedings. *See* 2019 N.M. Laws, ch. 211, § 4. Among other things, the amendments inserted a new Subsection (C) and renumbered the rest of the statute, including the subsections at issue in this appeal. *See id.* The amendments do not affect our analysis, and for ease of future reference and application, we cite the 2019 version of the statute throughout this opinion.

trial. In determining whether to order relief, the district court's analysis should be guided by the standard that applies to the specific form of postconviction relief requested. *See, e.g.*, *State v. Garcia*, 2005-NMSC-038, ¶ 8, 138 N.M. 659, 125 P.3d 638 (setting forth requirements for ordering a new trial); *Montoya v. Ulibarri*, 2007-NMSC-035, ¶ 1, 142 N.M. 89, 163 P.3d 476 (requiring a petitioner claiming actual innocence to demonstrate by clear and convincing evidence that no reasonable juror would have convicted the petitioner in light of the new evidence).

{2}     In this case, we conclude that the postconviction DNA test results obtained by Respondent/Cross-Petitioner Gregory Marvin Hobbs are exculpatory because they corroborate his claim that he acted in self defense when he shot and killed Ruben Archuleta Sr. (Ruben Sr.). While it is a close question, we also conclude that the district court did not abuse its discretion when it granted Hobbs's motion for a new trial based on its determination that the evidence would likely have resulted in a different verdict had it been available at trial. Because we disagree with the analysis set out and applied by the Court of Appeals and its resolution of this appeal, we reverse its decision and reinstate the district court's order for a new trial.

## I. BACKGROUND

### A. Hobbs's Conviction for Voluntary Manslaughter

{3}     This case arises from an altercation that resulted in two deaths.[2] As summarized by the district court, the evidence at trial showed that Hobbs and his friend, Juan Gonzales, were standing outside with a group of people when Ruben Sr. drove up and started yelling at Juan. Ruben Sr.'s son, Ruben Jr., lived nearby. Shortly after the altercation began, Ruben Sr.'s wife sent her other son, Max, to retrieve his older brother, Ruben Jr. Ruben Jr. grabbed his shotgun and entered the fray. Juan retreated to the passenger seat of his car in an apparent attempt to escape, but Ruben Sr. pursued him into the car. Ruben Jr. then stood outside the passenger's side of Juan's vehicle and pointed his shotgun at Juan. Hobbs testified that, because he believed his friend's safety was threatened, he pulled out his handgun and shot Ruben Jr.

{4}     The focus at trial was on what happened next between Hobbs and Ruben Sr. It was undisputed that Hobbs shot Ruben Sr. soon after he shot Ruben Jr. However, the jury considered conflicting evidence about whether Ruben Sr. and Hobbs were struggling for Hobbs's handgun at the time of the second shooting. An expert witness

---

[2]The State did not charge Hobbs in connection with the death of the first person, Ruben Archuleta Jr. (Ruben Jr.), after determining the killing was legally justified.

3

for the State testified on the basis of autopsy results that Hobbs shot Ruben Sr. four times. According to the witness, the shot that likely killed Ruben Sr. was fired at a downward angle into Ruben Sr.'s left chest from an estimated six to eight inches away. The witness further testified that a gunshot that entered at the bridge of Ruben Sr.'s nose was fired from more than two or three feet away. A third shot grazed Ruben Sr.'s right shoulder, corresponding to a defect in the t-shirt he was wearing when he was killed. Finally, Ruben Sr. had a superficial gunshot wound on the right side of his chest "involving skin and soft tissue."

{5}    Hobbs testified that Ruben Sr., who was eight to nine inches taller and approximately sixty pounds heavier than Hobbs, physically attacked him and tried to grab the gun. He further testified that he attempted to retreat but that Ruben Sr. grabbed him and began wrestling for the gun. Two eyewitnesses testified they saw Hobbs and Ruben Sr. "wrestling" or "fighting" for the gun.

{6}    The central thrust of the State's argument was that the physical evidence did not match Hobbs's claim that he shot Ruben Sr. in self defense. The State emphasized that Hobbs lacked any physical injuries indicative of a struggle, such as scrapes, scratches, or bruises, and argued that the physical evidence presented at trial did not support his testimony that he was "in a fight for his life over this gun."

4

According to the State, the evidence showed that Hobbs merely "turned and shot Ruben Archuleta Sr., who was unarmed."

{7}     The jury found Hobbs guilty of voluntary manslaughter after being properly instructed on self defense. The district court sentenced Hobbs to six years imprisonment, plus an additional year due to the use of a firearm in the commission of the offense.

**B.     Hobbs's Request for DNA Testing Pursuant to Section 31-1A-2**

{8}     Two years later, Hobbs petitioned under Section 31-1A-2 for DNA testing of the handgun with which he shot Ruben Sr. and of the t-shirt that Hobbs was wearing at the time of the incident. The State did not oppose the petition. Section 31-1A-2 establishes the procedures by which "[a] person convicted of a felony, who claims that DNA evidence will establish the person's innocence, may petition the district court . . . to order the disclosure, preservation, production and testing of evidence that can be subjected to DNA testing." Section 31-1A-2(A). As a condition of filing, the petitioner must agree to submit to DNA testing and must "authorize the district attorney's use of the DNA test results to investigate all aspects of the case that the petitioner is seeking to reopen." Section 31-1A-2(B).[3]

---

[3]Adopted with the 2019 amendments, Section 31-1A-2(C) provides that a petitioner's DNA samples "shall be submitted for DNA testing according to the procedures in the DNA Identification Act, and the DNA record shall be entered into

{9}    The statute also requires a petitioner to establish by a preponderance of the evidence that:

(1)    the petitioner was convicted of a felony;
(2)    evidence exists that can be subjected to DNA testing;
(3)    the evidence to be subjected to DNA testing:
(a)    has not previously been subjected to DNA testing;
(b)    has not previously been subjected to the type of DNA testing that is now being requested; or
(c)    was previously subjected to DNA testing, but was tested incorrectly or interpreted incorrectly;
(4)    the DNA testing the petitioner is requesting will be likely to produce admissible evidence; and
(5)    identity was an issue in the petitioner's case or that if the DNA testing the petitioner is requesting had been performed prior to the petitioner's conviction and the results had been *exculpatory*, there is a reasonable probability that the petitioner would not have pled guilty or been found guilty.

Section 31-1A-2(D) (emphasis added). Section 31-1A-2(H) provides that, if the petitioner satisfies the requirements set out in Subsections (B) and (D), the district court "shall order DNA testing" to be performed.

{10}    Of particular importance in this case is the requirement that a petitioner demonstrate both that the evidence sought would have been "exculpatory" had it been available prior to the petitioner's conviction, *and* that, based on this additional evidence, there is a reasonable probability that the petitioner would not have been

the federal bureau of investigation's national DNA index system for storage and exchange of DNA records submitted by forensic DNA laboratories." Section 31-1A-2(C) was not in effect at the time of the proceedings in this case.

6

adjudicated guilty. Section 31-1A-2(D)(5). The Legislature has not defined the meaning of "exculpatory" for purposes of this statute, but in his petition, Hobbs averred that if (as he postulated) the DNA test results demonstrated that Ruben Sr. touched the handgun and/or the t-shirt, the evidence would have been exculpatory had it been presented at trial because it would have contradicted the State's contention that no physical evidence supported Hobbs's claim of self defense. According to Hobbs, if the State's "central argument" had been rendered implausible by the presence of Ruben Sr.'s DNA on the handgun and t-shirt, "it is likely that the jury would have acquitted . . . Hobbs of voluntary manslaughter."

{11} In declining to oppose the petition, the State necessarily declined to litigate both the meaning of "exculpatory" within Subsection (D)(5) and the issue of whether the DNA petition satisfied the required reasonable probability that the evidence, had it been available prior to conviction, would have resulted in a not-guilty plea or

verdict. *See* § 31-1A-2(D)(5).[4] Thus, prior to ruling on the petition, the district court held only a brief hearing and confirmed the State did not oppose it. At the conclusion of the hearing, the district court stated that, having reviewed the statute, it appeared "the criteria ha[d] been met" and issued an order to submit the t-shirt and handgun for DNA testing.

**C.      Hobbs's Motion for a New Trial Based on the Results of DNA Analysis**

{12}      Once a district court has granted a Section 31-1A-2 petition and ordered DNA testing, the court's authority to award postconviction relief is governed by Section 31-1A-2(I), the main provision at issue in this case. Under that subsection, "[i]f the results of the DNA testing are *exculpatory*, the district court may set aside the petitioner's judgment and sentence, may dismiss the charges against the petitioner with prejudice, may grant the petitioner a new trial or may order other appropriate relief." *Id.* (emphasis added).

---

[4]At the district court's hearing on the petition, the State asserted that, in declining to oppose the petition requesting DNA testing, it was not "conced[ing] that such testing would be grounds for a new trial or . . . would in any way call into question the jury's verdict." Nonetheless, by failing to oppose the petition, the State declined an important opportunity to challenge Hobbs's claim that the evidence—if it demonstrated that Ruben Sr. had touched the gun or t-shirt—would be sufficient to create a reasonable probability that, had the evidence been available at trial, Hobbs would not have been found guilty. Merely asserting that it was not conceding the point surely did not substitute for the State's vigorously litigating it when the State had the opportunity to do so.

8

{13} Approximately a year after the district court granted his petition to test the handgun and t-shirt for DNA, Hobbs filed a motion to vacate his conviction or, in the alternative, to grant him a new trial. According to the motion, the results of the DNA analysis demonstrated that Ruben Sr. could not be excluded as a contributor to two mixtures of DNA found on the handgun and t-shirt, respectively. Consistent with his argument in support of his initial request for DNA testing, Hobbs argued that the newly obtained DNA results were exculpatory because they directly contradicted the State's claim at trial that Hobbs's theory of self defense lacked support from the physical evidence. He requested that the court vacate his conviction and dismiss the charges with prejudice because, in light of the DNA evidence, the State could no longer prove beyond a reasonable doubt that Hobbs did not act in self defense as a matter of law. In the alternative, Hobbs requested a new trial to permit a jury to "hear and weigh all of the evidence in the case, including the DNA test results."

{14} This time, the State mounted an opposition, arguing that the results were not exculpatory because they demonstrated at most "a possible link" between Ruben Sr. and the two pieces of physical evidence. According to the State, because the testing

9

was based on "touch DNA,"[5] which can result from either actual touching or from the secondary transfer of skin cells, the mere presence of Ruben Sr.'s DNA on the gun and t-shirt did not "necessarily corroborate" Hobbs's claim that Ruben Sr. grabbed the gun. The State contended that the presence of Ruben Sr.'s DNA on the gun and t-shirt could have resulted from his having attempted to push Hobbs away during their struggle. Moreover, the State argued, the DNA evidence "fail[ed] to justify [Hobbs's] repeated shooting of [Ruben Sr.]."

{15}    Prior to ruling on Hobbs's motion, the district court held an evidentiary hearing. Forensic scientist Eve Tokumaru, who performed the DNA testing on behalf of the New Mexico Department of Public Safety Forensic Laboratory, was the sole witness. Ms. Tokumaru explained that she had analyzed DNA mixtures she recovered from swabs taken from the slide on the top of the handgun, the ejection port of the handgun,[6] a magazine from the firearm, the front of Hobbs's t-shirt, and a DNA sample taken from Ruben Sr. as a standard. She concluded that Ruben Sr. "[could not] be eliminated as a possible contributor" to the DNA recovered from the

---

[5]According to the forensic scientist who conducted the DNA analysis, "touch DNA" is any sample of DNA that is not specifically collected "from a visible stain." It can result from, among other things, skin brushing against a fabric or directly touching an object.

[6]Ms. Tokumaru testified that the ejection port on the handgun she tested was on the top of the weapon, on the right side.

ejection port of the handgun and that he was a "minor contributor" to the DNA recovered from the t-shirt. Based on her statistical analysis of the DNA mixtures, Ms. Tokumaru opined that Ruben Sr.'s DNA was present on both the ejection port of the handgun and the t-shirt. On cross-examination, Ms. Tokumaru clarified that she would not say "to a reasonable degree of scientific certainty" that the samples contained Ruben Sr.'s DNA because her laboratory does not use that terminology anymore, but that it was her opinion that Ruben Sr. "could not be eliminated" as a contributor to the DNA found on the handgun or t-shirt. The district court, seeking to understand the findings in terms of whether they met the legal definition of "more likely than not," inquired whether Ms. Tokumaru could state that there was more than a fifty percent probability that Ruben Sr.'s DNA was on the gun or the t-shirt. Ms. Tokumaru said that she could not.

{16} At the conclusion of the hearing, the district court expressed a concern that, based on the expert witness's testimony, the DNA evidence might not meet the threshold for admissibility. The court denied Hobbs's request to vacate his conviction but requested additional briefing on the issue of admissibility and the effect of the evidence on any other possible relief. The district court later denied Hobbs's motion. The court agreed that the evidence at issue would be admissible at trial, but because Ms. Tokumaru was unable to state that there was a greater than

11

fifty percent probability that Ruben Sr.'s DNA was on the gun or the t-shirt, the court could not conclude that "the evidence would reasonably support Hobbs's claim of self defense." For the same reason, the district court determined the evidence was of "low probative value" due to other evidence of a struggle between Hobbs and Ruben Sr. and the firing of multiple gunshots. As a result, the court concluded that the test results were insufficient to create a reasonable probability that the jury would have found Hobbs not guilty.

**D.      Hobbs's Motion to Reconsider**

{17}     Hobbs filed a motion to reconsider, requesting leave to supplement the record with a more refined statistical analysis of the DNA test results. Hobbs's motion to reconsider included an affidavit from Dr. Greg Hampikian, a biology professor whose research focuses on DNA analysis. Dr. Hampikian stated in his affidavit that the method of DNA analysis used by Ms. Tokumaru was appropriate and had produced "a critical piece of evidence in this case," but is generally not conducive to the kind of probability determination requested by the district court at the original hearing. He also represented that he had reviewed Hobbs's test results and had begun a reanalysis of Ms. Tokumaru's data[7] using a computer program that performs

---

[7]Dr. Hampikian did not collect additional samples from the t-shirt or handgun, but instead subjected the data produced by Ms. Tokumaru to additional analysis using a software program that first identifies all genomic profiles present in a sample

12

probabilistic genotyping. Dr. Hampikian suggested that probabilistic genotyping would "produce likelihood ratios for the DNA inclusions and exclusions that may satisfy the [c]ourt's desire for statistical clarification." The State opposed Hobbs's motion to reconsider as "an untimely objection to the [c]ourt's question to [Ms.] Tokumaru's testimony regarding her DNA testing." The State also argued that the motion presented no new reasons "as to how or why the DNA results are exculpatory and reasonably tend[] to negate [Hobbs's] guilt."

{18}    The district court held a hearing at which Dr. Hampikian testified about probabilistic genotyping and the results of his reanalysis of the data from Hobbs's DNA test results. According to Dr. Hampikian, Ruben Sr.'s DNA is a "very strong match" with the DNA found on the ejection port of the handgun. Specifically, Dr. Hampikian estimated a one in ten million chance that someone other than Ruben Sr. had contributed the DNA sample recovered from the handgun. He stated that the corresponding 99.99999% chance that the DNA on the ejection port included Ruben Sr.'s DNA is a likelihood "far beyond" the standard for a paternity test.

{19}    After the hearing, the district court issued an order granting Hobbs's motion to reconsider and ordering a new trial. The court concluded that the DNA test results,

_____

and then compares those profiles to those submitted by persons of interest in a case (Hobbs and Ruben Sr. in this case).

13

including Dr. Hampikian's additional analysis and conclusions, are admissible and "probative [of Hobbs's]'s claim of self defense and could be exculpatory." The court further concluded that, although it was "a close case," Hobbs had "met the standard under NMSA 1978, [Section] 31-1A-2 for a new trial" because the burden was on the State to prove beyond a reasonable doubt that Hobbs did not act in self defense and because the DNA test results are "probative of the issue that [Ruben Sr.] at some point touched [Hobbs's] weapon." The State appealed and, following the Court of Appeals' reversal, we granted review on all questions raised in the State's petition and Hobbs's cross-petition for writs of certiorari.

## II.   DISCUSSION

### A.   DNA Evidence is Exculpatory Under Section 31-1A-2 When It Tends to Establish Innocence or Negate Guilt

{20}   Our first task is to clarify the Legislature's intended meaning of the word "exculpatory" in Section 31-1A-2(I). The meaning of an undefined statutory term presents a question of statutory interpretation, which we review de novo. *State v. Vest*, 2021-NMSC-020, ¶ 7, 488 P.3d 626. When construing a statute, our primary aim is to further the intent of the Legislature. *Id.* ¶ 14. To that end, "we first consider the plain meaning of the statute," giving undefined terms "their ordinary meaning absent clear and express legislative intention to the contrary." *Id.* (internal quotation

marks and citation omitted). "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Chakerian*, 2018-NMSC-019, ¶ 10, 458 P.3d 372 (internal quotation marks and citation omitted).

{21} Section 31-1A-2(I) provides that "[i]f the results of the DNA testing are exculpatory, the district court may set aside the petitioner's judgment and sentence, may dismiss the charges against the petitioner with prejudice, may grant the petitioner a new trial or may order other appropriate relief." The State argues that DNA evidence is exculpatory when it "*directly negates* guilt or *establishes* innocence." *See* § 31-1A-2(A) ("A person convicted of a felony, who *claims* that DNA evidence will *establish the person's innocence*, may petition the district court . . . to order the . . . testing of evidence that can be subjected to DNA testing." (emphasis added)). As such, the State's proffered definition equates evidence that is *exculpatory* with evidence that *exculpates*, that is, "frees the petitioner from blame." *See Exculpate*, Black's Law Dictionary (11th ed. 2019) (defining "exculpate" as "[t]o free from blame or accusation").

{22} We readily dispense with the State's proposed definition as contrary to the plain language of Section 31-1A-2(I). To start, we agree with the Court of Appeals that commonly used definitions of exculpatory do not define it as exoneration or

exculpation. *See State v. Hobbs*, 2020-NMCA-044, ¶ 31, 472 P.3d 1276 (noting that common definitions of exculpatory include "a variation of the verb phrase 'tends to' when discussing the required effect of the DNA evidence on a defendant's guilt"); *see also Vest*, 2021-NMSC-020, ¶ 14 (noting that "we consult common dictionary definitions" in determining a word's ordinary meaning). Exculpatory means "*tending* to exculpate," that is, *tending to* establish innocence or negate guilt. *Exculpatory*, Webster's Third New International Dictionary (1993) (emphasis added); *see also, e.g.*, *Evidence*, Black's Law Dictionary (11th ed. 2019) (defining "exculpatory evidence" as "[e]vidence *tending* to establish a criminal defendant's innocence" (emphasis added)); *cf. Buzbee v. Donnelly*, 1981-NMSC-097, ¶ 45, 96 N.M. 692, 634 P.2d 1244 (considering whether, in the context of the former grand jury statute, "'[e]xculpatory evidence is evidence reasonably *tending* to negate guilt'" (emphasis added) (quoting *State v. Gonzales*, 1981-NMCA-023, ¶ 3, 95 N.M. 636, 624 P.2d 1033, *overruled on other grounds by Buzbee*, 1981-NMSC-097, ¶ 46)). Tending to exculpate is fundamentally different from actually doing so, and we defer to the Legislature's use of the adjectival form "absent clear and express legislative intention to the contrary." *Vest*, 2021-NMSC-020, ¶ 14 (internal quotation marks and citation omitted). Put simply, had the Legislature intended to limit

postconviction relief to when the DNA test results in fact *exculpate* the petitioner—rather than when they are merely *exculpatory*—it would have clearly said so.

{23} Moreover, adopting the State's proffered definition of exculpatory would introduce a needless conflict with Section 31-1A-2(D)(5). As we have noted, that provision also uses the term "exculpatory" in setting forth the requirements for a petition for DNA testing. *See id.* (requiring petitioner seeking postconviction DNA testing to demonstrate "that if the DNA testing the petitioner is requesting had been performed prior to the petitioner's conviction and the results had been exculpatory, there is a reasonable probability that the petitioner would not have pled guilty or been found guilty"). "[I]t is considered a normal rule of statutory construction to interpret identical words used in different parts of the same act [as having] the same meaning." *State v. Jade G.*, 2007-NMSC-010, ¶ 28, 141 N.M. 284, 154 P.3d 659 (second alteration in original) (internal quotation marks and citation omitted). Applied to Subsection (D)(5), the State's definition of exculpatory would impermissibly render a portion of that provision surplusage. *See, e.g.*, *Ashlock v. Sunwest Bank of Roswell, N.A.*, 1988-NMSC-026, ¶ 9, 107 N.M. 100, 753 P.2d 346 ("[T]he language of a statute must be construed so that no part of the statute is rendered surplusage."), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 16, 120 N.M. 133, 899 P.2d 576. If the hoped-for DNA test

results would establish a petitioner's innocence, there would never be a need for a petitioner to demonstrate that the results would create "a reasonable probability that the petitioner would not have pled guilty or been found guilty." Section 31-1A-2(D)(5). Evidence that meets the State's definition of exculpatory would exceed the reasonable probability standard in every case and effectively nullify the requirement to meet that standard under the statute.

{24}    Finally, the State's proffered definition of exculpatory is incompatible with the Legislature's decision to grant the district court broad discretion to award postconviction relief after a finding that DNA evidence is exculpatory. *See* § 31-1A-2(I) (providing that "the district court *may* set aside the petitioner's judgment and sentence, *may* dismiss the charges against the petitioner with prejudice, *may* grant the petitioner a new trial or *may* order other appropriate relief" (emphases added)). *Compare* NMSA 1978, § 12-2A-4(B) (1997) ("'May' confers a power, authority, privilege or right."), *with* § 12-2A-4(A) ("'Shall' and 'must' express a duty, obligation, requirement or condition precedent."). Were relief available only when the evidence actually establishes a petitioner's innocence, the district court would have little to no discretion about the appropriate remedy; in that circumstance, the conviction must be set aside and the petitioner set free. *See Montoya*, 2007-NMSC-035, ¶ 1 ("[T]he continued incarceration of an innocent person is contrary to both

18

due process protections and the constitutional prohibition against cruel and unusual punishment within the New Mexico Constitution."). The district court's discretion under Section 31-1A-2(I) to award lesser relief, including "a new trial or . . . other appropriate relief," necessarily means that DNA test results can be exculpatory under that section without establishing a petitioner's innocence.

**B.     To Be Exculpatory, Postconviction DNA Evidence Does Not Need to Satisfy the Four Requirements Adopted by the Court of Appeals**

{25}     The Court of Appeals properly held that DNA evidence is exculpatory under Section 31-1A-2(I) "when it reasonably tends to negate the petitioner's guilt." *Hobbs*, 2020-NMCA-044, ¶ 33. The Court obtained that definition from *Buzbee*, 1981-NMSC-097, a case that considered the prosecution's duty to present contradictory evidence to the grand jury under the former grand jury statute. *Id.* ¶ 5. *See Hobbs*, 2020-NMCA-044, ¶ 30 (citing *Buzbee*, 1981-NMSC-097, ¶¶ 44-46). However, instead of applying *Buzbee*'s definition of exculpatory to the facts of Hobbs's case, the Court of Appeals opted to provide "guidance on *how* to apply that definition." *Hobbs*, 2020-NMCA-044, ¶ 34 (emphasis added). In so doing, the Court of Appeals effectively supplanted *Buzbee*'s definition with four requirements that it adapted from the standard for granting a new trial based on newly discovered evidence. *Hobbs*, 2020-NMCA-044, ¶¶ 34-42; *see also Garcia*, 2005-NMSC-038, ¶

19

8 (setting forth requirements for ordering a new trial based on newly discovered evidence). In the pivotal language of the opinion, the Court of Appeals held:

> DNA evidence is exculpatory under Section [31-1A-2(I)]—that is, it reasonably tends to negate the petitioner's guilt—when it (1) is material; (2) is not merely cumulative; (3) is not merely impeaching or contradictory; and (4) raises a reasonable probability that the petitioner would not have pled guilty or been found guilty had the DNA testing been performed prior to the conviction.

*Hobbs*, 2020-NMCA-044, ¶ 42. The Court further held that in any order granting or denying relief under Section 31-1A-2(I), "the district court *shall* enter findings of fact and conclusions of law addressing each of the four requirements." *Hobbs*, 2020-NMCA-044, ¶ 43 (emphasis added).

{26}    We disagree that the requirements for granting a new trial are germane—let alone essential—to whether evidence is exculpatory under Section 31-1A-2(I). The Court of Appeals' analysis conflates the threshold question under Section 31-1A-2(I) of whether the evidence is exculpatory with the central question of whether postconviction relief is appropriate. The result is a redundant definition, effectively requiring the district court to conclude that the evidence supports a new trial *before* the court may consider whether, for example, to grant a new trial. In our view, the two inquiries are distinct: "*If* the results of the DNA testing are exculpatory," only then *may* the district court award relief, including "grant[ing] the petitioner a new

20

trial or . . . order[ing] other appropriate relief." Section 31-1A-2(I) (emphasis added); *see also, e.g.*, *State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183 ("When interpreting a statute, we are also informed by the . . . overall structure of the statute, as well as its function within a comprehensive legislative scheme." (internal quotation marks and citation omitted)).

{27}	Thus, whether DNA evidence is exculpatory is the beginning, rather than the end, of the inquiry under Section 31-1A-2(I). A threshold finding that evidence is exculpatory—that is, that it *tends* to negate guilt or establish innocence—merely allows the district court to consider the essential question of whether to grant relief, which must be determined under the standard that applies to the particular form of relief at issue. *See, e.g.*, *Garcia*, 2005-NMSC-038, ¶ 8 (setting forth the standard for ordering a new trial based on newly discovered evidence); *Montoya*, 2007-NMSC-035, ¶ 1 (requiring a petitioner seeking habeas relief based on actual innocence to demonstrate by clear and convincing evidence that no reasonable juror would have convicted him or her in light of the new evidence). Accordingly, we disavow the Court of Appeals' conclusion that evidence is not exculpatory under Section 31-1A-2(I) unless it satisfies the standard for granting a new trial.

## C.     Hobbs's DNA Test Results Are Exculpatory

{28}     Under established New Mexico law, exculpatory evidence includes the broad swath of evidence that would be relevant to the defendant's innocence at trial. *See Buzbee*, 1981-NMSC-097, ¶ 48. Whether evidence reasonably tends to establish innocence or negate guilt "is to be determined by objectively analyzing the . . . evidence to determine whether, in fact, it tended to [establish innocence or] negate guilt." *State v. Herrera*, 1979-NMCA-103, ¶ 10, 93 N.M. 442, 601 P.2d 75, *overruled on other grounds by Buzbee*, 1981-NMSC-097, ¶ 46; *cf. State v. Pacheco*, 2008-NMCA-131, ¶¶ 40-41, 145 N.M. 40, 193 P.3d 587 (holding that evidence of a driver's flight from a vehicle containing methamphetamines should have been admitted as evidence tending to negate a defendant's guilt because it was probative of whether the driver, and not the defendant, was the guilty party). Conversely, when evidence supports the defendant's guilt rather than negates it, the evidence fails to meet the standard. *See Gonzales*, 1981-NMCA-023, ¶¶ 4-5 (holding that testimony was not exculpatory when it was consistent with the victim's, rather than the defendant's, version of events).

{29}     We have little trouble concluding that Hobbs's DNA test results are exculpatory under the standard we have adopted. The results reasonably tend to establish Hobbs's innocence or negate his guilt by confirming the presence of

physical evidence that corroborates his version of events, which was critical to his self-defense claim. Evidence of Ruben Sr.'s DNA on the gun and t-shirt is relevant and probative of Hobbs's testimony that Ruben Sr. physically attacked him and tried to grab the gun. *See* Rule 11-401 NMRA ("Evidence is relevant if [(A)] it has any tendency to make a fact more or less probable than it would be without the evidence, and [(B)] the fact is of consequence in determining the action."). While there was eyewitness testimony at trial supporting Hobbs's claim that he and Ruben Sr. struggled before the fatal shot was fired, given the complete absence of any other physical evidence to corroborate Hobbs's version of events, we agree with the district court that the test results would have been admissible on the question of whether Hobbs acted in self defense.

**D.      The District Court Did Not Abuse Its Discretion in Granting a New Trial**

{30}      Having determined that the evidence was exculpatory, our final task is to determine whether the district court erred when, in applying Section 31-1A-2(I), it ordered a new trial in this case. We have long held that "the function of passing upon motions for new trial on newly discovered evidence belongs naturally and peculiarly, although not exclusively, to the trial court." *State v. Romero*, 1938-NMSC-027, ¶ 15, 42 N.M. 364, 78 P.2d 1112. Accordingly, "we will not disturb a trial court's exercise of discretion in denying or granting a motion for a new trial unless there is

23

a manifest abuse of discretion." *Garcia*, 2005-NMSC-038, ¶ 7. "[A] trial court abuses its discretion when it acts in an obviously erroneous, arbitrary, or unwarranted manner." *State v. Aguilar*, 2019-NMSC-017, ¶ 30, 451 P.3d 550 (internal quotation marks and citation omitted). Significantly in this case, "a much stronger showing is required to overturn an order granting the new trial than denying a new trial." *Id.* ¶ 29 (internal quotation marks and citation omitted).

{31} To order a new trial based on newly-discovered evidence, the evidence must satisfy the following requirements:

> [(1)] it will probably change the result if a new trial is granted; [(2)] it must have been discovered since the trial; [(3)] it could not have been discovered before the trial by the exercise of due diligence; [(4)] it must be material; [(5)] it must not be merely cumulative; and [(6)] it must not be merely impeaching or contradictory.

*Garcia*, 2005-NMSC-038, ¶ 8. We generally treat these requirements as mandatory. *See id.* ("A motion for a new trial on grounds of newly-discovered evidence will not be granted unless the newly-discovered evidence fulfills all of [the stated] requirements.") However, the Legislature has decided to grant the district court discretion to order a new trial for a defendant who successfully petitions for relief based on DNA evidence that may or may not be newly discovered. Accordingly, the second and third requirements are obviated for motions pursued under the statute. *See* § 31-1A-2(D) (authorizing petitioning for postconviction relief based on the

24

existence of evidence that may be subjected to DNA testing); § 31-1A-2(I) (authorizing the district court to grant postconviction relief if DNA test results are exculpatory). The central question under Section 31-1A-2(I) is whether and to what extent the postconviction DNA evidence would have changed the result of the petitioner's trial, taking into consideration whether such evidence is (a) material, and (b) not merely cumulative, impeaching, or contradictory.[8] *See Montoya*, 2007-NMSC-035, ¶ 29 ("In order to warrant a new trial on the basis of newly discovered evidence, a petitioner must show that the evidence 'will probably change the result if a new trial is granted.'" (quoting *Garcia*, 2005-NMSC-038, ¶ 8)). "The probability of the new evidence changing a verdict is a question addressed to the sound discretion of the trial court." *Garcia*, 2005-NMSC-038, ¶ 9 (internal quotation marks and citation omitted).

{32}     The State argues that Hobbs's DNA evidence is "merely cumulative" and therefore cannot support a new trial. The State points out that the jury convicted Hobbs despite evidence that included: (1) expert and eyewitness testimony that there

---

[8]The standard that applies to a motion for postconviction relief necessarily depends upon the relief at issue. In this case, the State is challenging the district court's decision to grant Hobbs a new trial. We therefore examine whether the district court abused its discretion in evaluating the DNA evidence in this case under the standard for granting a new trial. *See Aguilar*, 2019-NMSC-017, ¶¶ 25-26 (setting out the standards for new-trial motions pursued under Rule 5-614 NMRA).

was a physical struggle between Hobbs and Ruben Sr., (2) expert testimony that at least one shot was fired from close range, and (3) expert testimony that the gunpowder on Ruben Sr.'s shirt did not line up with the wound to his left chest, suggesting that Ruben Sr. was being held when he was shot by Hobbs. The State argues that, having already heard and discounted this trial evidence, the jury would not have been persuaded by Hobbs's DNA evidence showing that Ruben Sr. had touched the gun.

{33} The State's argument has considerable force. However, we are charged solely with determining whether the district court's decision to grant Hobbs a new trial was "clearly against the logic and effect of the facts and circumstances of the case." *Aguilar*, 2019-NMSC-017, ¶ 28 (internal quotation marks and citation omitted). Moreover, "when [an] appellate court is reviewing a grant of a new trial, the grant can be affirmed as within the trial court's discretion even where the trial court would also have been acting within its discretion to deny the new trial motion." *Id.* ¶ 29. That instruction is apt in this instance; as the district court observed, whether Hobbs's DNA test results support a new trial is a "close case."

{34} Indeed, the central question for the jury—whether Hobbs killed Ruben Sr. after "sufficient provocation" or acted reasonably in self defense—can be a particularly close question. *See State v. Kidd*, 1917-NMSC-056, ¶¶ 5-6, 24 N.M.

572, 175 P. 772. The line between voluntary manslaughter and justifiable homicide in self defense "is not always clearly defined and depends upon the facts of each case as it arises." *Id.* ¶ 6; *cf. State v. Lopez*, 1968-NMSC-092, ¶ 13, 79 N.M. 282, 442 P.2d 594 ("[W]hen facts are present which give rise to a plea of self-defense, it is not unreasonable that if the plea fails, the accused should be found guilty of voluntary manslaughter."); *State v. Melendez*, 1982-NMSC-039, ¶ 9, 97 N.M. 738, 643 P.2d 607 (discussing the difference between self defense and the provocation required to prove voluntary manslaughter and noting that the two are "not mutually incompatible").

{35}    Importantly, it is the State's burden to prove beyond a reasonable doubt that Hobbs did *not* act in self defense, as evidenced by the following jury instructions given at trial:

**INSTRUCTION NO. 3**

For you to find [Hobbs] guilty of voluntary manslaughter as charged in Count 1, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.    [Hobbs] killed [Ruben Sr.];

2.    [Hobbs] knew that his acts created a strong probability of death or great bodily harm to [Ruben Sr.];

3.    [Hobbs] acted as a result of sufficient provocation;

27

4. [Hobbs] did not act in self defense;

. . .

**INSTRUCTION NO. 7**

. . .

The burden is on the state to prove beyond a reasonable doubt that [Hobbs] did not act in self defense. If you have a reasonable doubt as to whether [Hobbs] acted in self defense you must find [Hobbs] not guilty.

*See* UJI 14-221 NMRA; UJI 14-5171 NMRA. The question of whether to order a new trial in this case thus turns on whether the presence of Ruben Sr.'s DNA on Hobbs's handgun and t-shirt will likely change the result of Hobbs's trial by creating "a reasonable doubt as to whether [Hobbs] acted in self defense." *See* UJI 14-5171.

**{36}** The DNA results elicited by Hobbs's successful Section 31-1A-2(A) petition are the only physical evidence tending to corroborate his testimony that Ruben Sr. was trying to grab the gun when Hobbs shot him in self defense. While there was testimonial evidence at trial describing Hobbs and Ruben Sr. "wrestling" or "fighting" for the gun, the existence of evidence that Ruben Sr.'s DNA was on the gun could be sufficient to "turn the scales" in Hobbs's favor in a new trial. *Contra Garcia*, 2005-NMSC-038, ¶ 12 ("[M]erely cumulative means cumulative evidence the weight of which would probably be insufficient to turn the scales in defendant's favor." (emphasis, internal quotation marks, and citation omitted)); *see also State v.*

28

*Melendez*, 1981-NMCA-027, ¶ 7, 97 N.M. 740, 643 P.2d 609 (finding that recovery of a bullet from the hood of the defendant's car and evidence of its angle of entry was not merely cumulative evidence because it bolstered the defendant's theory of self defense and bore on the credibility of two witnesses at trial), *rev'd on other grounds*, 1982-NMSC-039, ¶¶ 9-13, *holding modified by State v. Baca*, 1992-NMSC-055, ¶ 7, 114 N.M. 668, 845 P.2d 762. This determination is strengthened by the fact that the central thrust of the State's argument against Hobbs's self-defense claim at trial was that Hobbs's account lacked support in the physical evidence. In its closing argument, the State argued that "none of the testimony exactly matches the physical evidence" and asked the jury "where is there any evidence of a strike, where are the scrapes, where are the scratches, where are the bruises . . . if [Hobbs] is in a fight for his life over this gun?" In these circumstances, and recognizing that a different court might reasonably have determined otherwise, we cannot say that physical DNA evidence supporting Hobbs's claim that Ruben Sr. grabbed the handgun would be merely cumulative, such that the district court's decision to grant Hobbs a new trial was "obviously erroneous, arbitrary, or unwarranted." *Aguilar*, 2019-NMSC-017, ¶ 30 (internal quotation marks and citation omitted). [9]

[9] The State did not argue the other factors for granting a new trial based on newly discovered evidence—that is, that the evidence was not material or was

29

{37} The Legislature has determined that postconviction relief is available when the evidence considered by the jury did not include DNA evidence that probably would have changed the result at trial. *See* § 31-1A-2(D)(5). Because reasonable minds may differ about the probable effect of Hobbs's DNA evidence on the jury's verdict, we defer to the district court's determination that the evidence supports a new trial. *See State v. Ferry*, 2018-NMSC-004, ¶ 2, 409 P.3d 918 ("If proper legal principles correctly applied may lead to multiple correct outcomes, deference is given to the district court judge because if reasonable minds can differ regarding the outcome, the district court judge should be affirmed.").

{38} The State's remaining arguments about why the DNA test results do not merit a new trial raise factual issues that fail as a matter of law. The jury at Hobbs's new trial may consider the appropriate weight of the DNA test results in the context of all of the other evidence presented at trial, including whether the DNA evidence actually proves that Ruben Sr. touched the gun,[10] whether it sufficiently corroborates

merely impeaching or contradictory—and we therefore do not consider those factors in our analysis.

[10]The State argues that, because "touch DNA" may result from secondary transfer, it does not establish that Ruben Sr. actually touched the gun. This argument goes to the weight of the DNA evidence and therefore is a matter for the jury at Hobbs's new trial. *See, e.g.*, *State v. Duran*, 1994-NMSC-090, ¶ 14, 118 N.M. 303, 881 P.2d 48 (holding that where DNA evidence was admissible, "[a]ny debate over the resulting probabilities that the 'match' is random goes to the weight of the evidence and is properly left for the jury to determine").

30

Hobbs's version of events, whether Hobbs's reaction was reasonable or evidence of overkill, and whether Hobbs or Ruben Sr. initiated the altercation.

**E.     The State's Procedural Argument Was Not Preserved**

**{39}**     As a final matter, the State argues the district court's order granting a new trial must be reversed because the district court relied on evidence obtained from a "second round" of DNA testing without requiring a second petition for DNA testing under Section 31-1A-2(D).

**{40}**     "To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked." Rule 12-321(A) NMRA. Here, the district court considered Dr. Hampikian's testimony in the context of deciding Hobbs's timely motion to reconsider, which explicitly requested leave to reopen the record to submit additional evidence. The State opposed the motion to reconsider on various grounds without arguing that a second petition and order were required. In fact, after performing a brief voir dire of Dr. Hampikian at the hearing, the State did not object to his qualification as an expert witness or to the admission of his expert testimony and report. Because the State failed to raise its argument below, we decline to address the State's argument on appeal.

**{41}**     Likely anticipating our conclusion that this argument was not preserved, the State urges us to consider its argument under our authority to review for fundamental

31

error. *See* Rule 12-321(B)(2) (listing exceptions to the preservation requirement including "issues involving . . . fundamental error"). "The doctrine of fundamental error is invoked when a court considers it necessary to avoid a miscarriage of justice." *State v. Alingog*, 1994-NMSC-063, ¶ 10, 117 N.M. 756, 877 P.2d. 562. "Our rules requiring the preservation of questions for review are designed to do justice, and it is only when the merits of applying those rules clearly are outweighed by other principles of substantial justice that we will apply the doctrine of fundamental error." *Id.* ¶ 11.

{42} The State claims that fundamental error review is warranted in this case because "the district court's consideration of the probabilistic genotyping evidence implicates a fundamental unfairness in the judicial system that undermines judicial integrity." The premise of the State's claim is that the district court permitted Hobbs to violate the plain language of Section 31-1A-2 by considering the new DNA analysis without first requiring Hobbs to submit a second petition for additional testing. However, the State has offered no explanation of how the district court's consideration of the evidence resulted in a miscarriage of justice. *See Alingog*, 1994-NMSC-063, ¶ 15 (holding that review of unpreserved error was improper where error did not result in a miscarriage of justice). Additionally, the State has cited no authority in support of its position that a district court's departure from the plain

32

language of a statute, without more, constitutes an injustice warranting fundamental error review. We therefore decline to apply the doctrine in this case.

**III.    CONCLUSION**

{43}    We reverse the Court of Appeals, reinstate the district court's order for a new trial, and remand to the district court for further proceedings consistent with this opinion.

{44}    **IT IS SO ORDERED.**

_____

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

_____

**C. SHANNON BACON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**DAVID K. THOMSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice, Retired,
Sitting by Designation**